OPINION OF THE COURT
William D. Friedmann, J.
This Wade (United States v Wade, 388 US 218 [1967]) type suppression hearing places in focus various aspects of seller identification or confirmation emanating from a street narcotic "buy and bust” purchase made by an undercover police officer.
THE STREET BUY AND BUST TRANSACTION
We are often reminded that eyewitness identification testimony is sometimes the most valuable type of evidence and yet too often the least reliable (Taylor, Reliability of Eyewitness Identification, 15 [No. 3] Trial Law Q [NYS Trial Lawyers Assn] 10 [1983]). Accordingly, the reliability of eyewitness identification, as communicated to another and relied upon by that other as constituting the probable cause basis for an arrest by the other, must be carefully scrutinized.
Reliance upon someone else’s identification is frequently employed in the classic street narcotic "buy and bust” transaction as justification for the arrest of an alleged narcotic seller.
This street purchase setup has been refined by the current use of the handheld radio transmitter and receiver commonly used by police drug enforcement street teams. (For preradio era street buy and bust considerations, see, People v Morales, 37 NY2d 262 [1975].)
The standard buy and bust scenario as reported to this court (at numerous recent suppression hearings) is that an undercover police officer using premarked currency makes a drug purchase at a crime scene (the set). As soon as possible the undercover officer, when away from the buy location, radios information concerning the purchase (what, where and from whom) to backup police personnel who are within radio reception range. Sometimes a "ghost” companion is within observation range of the buy location. Within minutes after the radio communication is received, the backup personnel get to the buy location or set from their waiting position a reasonable distance away. At the set, or nearby, a person or persons matching the prior radioed description are sought and held for detention. An arrest with resulting search and seizure of tangible property (drugs, marked money, etc.) is then made. *672 (This seized evidence cannot be considered part of any justifiable probable cause predicate.) Within minutes, the undercover sees the apprehension or is radioed that an apprehension has taken place and that a confirmation of selection pass is needed. Within minutes, the undercover makes a "pass by the scene” confirmation to verify that the right person or persons have been selected or apprehended based upon the previously radioed information (on-the-scene showup).
In this type of situation, which relies upon derivatively obtained identification information, the mind of the eyewitness, the undercover officer and/or protective ghost, must be three dimensional. The first level consists of the acquisition of as much distinguishable data as possible. At this stage all aspects of the "buy” transaction should be stored in the eyewitness’s memory. The second level involves a retrieval of identificational data as the memory is scanned and the relevant information is pulled out and communicated to the backup team. The third level involves the retention of identifying information for future use at a Grand Jury, pretrial hearings and/or trial.
This derivative identificational procedure is necessitated because the undercover officer’s personal safety and continued effectiveness would be greatly threatened by requiring his or her continued presence or return to the crime scene for further confrontation with the narcotics seller.
It is also clear that the person or persons (backup team) who are called to act upon the derivatively obtained identification information must act with three immediate purposes in mind. First, get and preserve the maximum amount of information concerning the "buy” transaction and a description of the sale participants to reasonably preclude an apprehension or arrest based upon inadequate identification or misidentification. Secondly, to insure reliability of selection, by facilitating an arrest within the shortest amount of time between the "buy” and the apprehension of the suspect; and thirdly, to seek as soon as possible in the interests of fairness a selection confirmation confrontation, or street "showup” between the undercover purchaser and the accused seller, to insure that the apprehension selection, based upon the derivatively acquired descriptive information, has been correctly executed.
RELEVANT FACTS CONCERNING THE PURCHASE HERE
An undercover officer with three months’ prior undercover *673 experience made a narcotic street purchase while in her car from two male blacks. At the suppression hearing, the officer had no current recollection about the incident. However, her notes made after a station house showup indicated that the transaction had lasted 2 or 3 minutes; that the sellers had approached her parked car from across a street and they had come from a group of six or more young male blacks whose descriptions were not noted. Sometime after, she radioed the fact that a "buy” had taken place and gave the location and a rudimentary description of the sellers to her backup team. The defendants were apprehended a block from the purchase location (the set) as persons matching the description radioed by the undercover officer. No buy money was recovered from either defendant and no confirmatory pass was made by the undercover, although she had been advised by radio as to their apprehension. Seven hours later a one-on-one showup of each defendant took place at the 105th Precinct with the undercover officer confirming, for the first time, the defendants as the sellers involved. The undercover officer had made a total of four purchases on the day in question.
THE STATION HOUSE SHOWUP
No on-the-scene showup took place. A station house showup is the only identification and/or confirmatory procedure relied on here. No conceivable excuse for its sole employment was offered. It seems hard to conceive of any set of circumstances from which it could not be successfully contended that a station house showup is anything but suggestive. Whether made by a civilian or a police officer, the very nature of displaying a person alone in an isolated setting, whether it is termed a "confirmatory” procedure or an identification procedure (People v Rubio, 118 AD2d 879), doesn’t appear to alter the conclusion that it is, by its very nature, suggestive. The viewer is given no viable selection "choice”, or alternative, other than outright rejection or affirmation of a single isolated individual. Therefore, this court must conclude that every station house showup is highly suggestive regardless of when and how conducted. (People v Adams, 53 NY2d 241, 249 [1981], citing People v Brown, 20 NY2d 238, 244; People v Ballott, 20 NY2d 600, 606-607; People v Logan, 25 NY2d 184, 191.)
This conclusion seems to be buttressed by the regulations of the New York Police Department which do not accord exceptional consideration for police personnel viewing a showup.
*674 The Legal Bureau of the New York City Police Department has issued precise guidelines for the conducting of an "Identification Show-up” (Eyewitness Identification Procedures, Oct. 1983).
In relevant part, these guidelines state:
"eyewitness identifications: the procedures
"i. SHOWUPS
"A. The one-on-one display > of a suspect to a victim is generally prohibited as being unnecessarily suggestive, except:
"1. where it is conducted promptly on-the-scene; or
"2. where there is in an emergency hospital situation (witness critically injured and likely to die).
"B. Reasons why a prompt on the scene or hospital showup is allowed:
"1. Witness views suspect while recollection is fresh, therefore, there is less likelihood of mistaken identification.
"2. If the suspect is not the perpetrator, he can be released with minimum delay.
"3. If the suspect is not the perpetrator, police can resume search without delay to locate the real perpetrator.
(note) all showups should be motivated by and consistent WITH THE ABOVE PURPOSES.
"C. Showup Procedures — A police officer should consider the following factors when determining if a prompt on the scene showup is permissible:
* * *
"4 Showups should not be conducted at a stationhouse. ”
As a general proposition this court sees no justifiable differentiation between showups viewed by a crime victim and/or a police observer. The People’s contention that suggestiveness of any showup is mitigated because a police officer purchaser is a trained experienced observer, is not on balance, that persuasive. (But cf., on the facts, People v Morales, 37 NY2d 262, supra; People v Rubio, 118 AD2d 879, supra; People v Chapman, 122 AD2d 147.) Trained observation and retention, etc., can be blurred by similar repetitive experience — as police undercover purchasers are unfortunately too often involved in volume activity having common denominators. They make numerous purchases on the same day or night, day in and day *675 out. These purchases are made from similar appearing sellers clothed in very similar street garb, etc.
Then what value, if any, does such a station house showup procedure serve? Obviously, if it is proceeded by an on-the-scene confirmatory pass, it represents very little value, except to give the People a bolstering procedure to impress a subsequent trier of the facts or to afford the basis of subsequent paperwork preparation.
If it is not proceeded by an on-the-scene pass, it can be very prejudicial in that such showup viewing can, as a very practical matter, become the real basis for the preparation of police forms and reports, eclipsing any possibly retained on-the-scene observations.
CONCLUSIONS
There was no on-the-scene showup here. (See, People v Martinez, 79 AD2d 661, 662; People v Morales, supra.) The only confirmation of selection took place at the station house. That showup was conducted some seven hours after the street purchase. This court holds that that showup was improper and suggestive and, therefore, constitutionally impermissible (compare with, People v Adams, 53 NY2d 241, supra).
Having determined by a preponderance of the hearing evidence that the "station house showup” procedure was constitutionally impermissible, this court must now evaluate whether the People have established by clear and convincing evidence that the prospective in-court identification testimony of the undercover purchaser is based upon her on-the-scene observations rather than from her observations at the unfair showup confrontation conducted seven hours later, but before her purchase paperwork was prepared (United States v Wade, 388 US 218, supra; People v Rahming, 26 NY2d 411; People v Ballott, 20 NY2d 600, supra).
A review of both the testimony of the undercover and arresting officer indicates no current recollections and that an inadequate amount of information about the purchase transaction and participants was acquired, stored, transmitted and/ or retained to constitute an adequate independent source to support any prospective in-court identification testimony about the defendants.
Therefore, the prospective identification testimony is suppressed.
*676 RECOMMENDATIONS TO THE POLICE DEPARTMENT
The court makes the following recommendations to the narcotics enforcement branches of the New York City Police Department.
Have a member of a backup field team equipped with an instant color Polaroid-type camera (Spectra, etc.) with a clocking device. Take a number of pictures of the apprehended drug sellers at or near the crime scene. By radioed communication arrange with the undercover purchaser and the protective ghost to view the photos near the crime scene and determine or confirm the accuracy of the apprehension selection. The implementation of this simple and inexpensive procedure would, it is submitted, efficiently and effectively achieve the following:
1. Make a confirmatory pass back at or near the crime scene unnecessary, thus insuring the future safety and confidentiality of the undercover operatives.
2. Overcome the often made contention of sloppy police work when an on-the-scene confirmatory pass is forsaken for safety, confidentiality and/or other reasons.
3. Eliminate the use of suggestive station house showups which sometimes cannot be arranged for many hours after a defendant’s arrest.
4. Creation of evidence which would enable a suppression court to better access Wade identification issues.
5. From a prosecution standpoint eliminate many identification and apprehension confirmations that now mar or impact the standard street buy and bust featuring a radio identification acted upon by another person who did not witness the drug purchase transaction.
It can hardly be disputed that the better the detail of the description of the seller communicated by the undercover purchaser, the more accurate and correct will be the basis for the field teams’ apprehension selection. Perhaps an official quick check-circle reference form (to be preserved for use by both the undercover and field team) might make communication of the purchase/location and description of sellers more effective and eliminate many of the problems that very often impregnate suppression hearings.
*677 As a further and last suggestion which would eliminate many problems would be the development or procurement of a more sophisticated handheld radio and/or transmitter with tape recording capability to recover and preserve the radioed communication between the undercover purchaser and his or her backup personnel.